**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 1, 2026

**BY EMAIL**
The Honorable Valerie Figueredo
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. FLOWERS, PORTER, and HARRIS,* 26 Cr. 430 (LJL)**

Dear Judges Figueredo and Judge Liman:

This morning, the Court unsealed Indictment 26 Cr. 430 (LJL) (the "Indictment"), which charges DWIGHT FLOWERS, TERRENCE PORTER, and TALEAK HARRIS with multiple crimes relating to a months-long firearms and narcotics trafficking scheme involving nearly 100 firearms. In advance of the presentments of the defendants that are expected to occur later today, the Government respectfully submits this letter to provide the Court and defense counsel with a summary of the charges in the Indictment and the bases for the Government's motion for pretrial detention of all three defendants.[1] As described below, there is no condition or combination of conditions that will reasonably assure the safety of the community or the appearance of the defendants as required.

The facts described below come from, among other sources, law enforcement reports, surveillance videos, records and communications obtained from online accounts and electronic devices.

[1] FLOWERS and PORTER were arrested in the Eastern District of New York and are expected to be presented before Judge Figueredo later today. HARRIS was arrested in the Eastern District of Virginia and is expected to be presented there later today. While Judge Figueredo will not preside over the presentment of HARRIS, which is to occur in Virginia, the Government nevertheless sets forth the bases for detention of HARRIS in this letter for completeness and to provide additional information about the co-conspirator and now co-defendant with whom FLOWERS and PORTER were closely working.

## I. The Indictment and the Arrests

In September 2026, a grand jury sitting in the Southern District of New York returned the twelve-count Indictment, which charges FLOWERS, PORTER, and HARRIS with crimes related to their involvement in multiple controlled sales of firearms and cocaine to an undercover law enforcement officer (the "UC") between in or about May and September 2026. FLOWERS, PORTER, and HARRIS are all charged with engaging in a firearms trafficking conspiracy, in violation of 18 U.S.C. § 933. FLOWERS and PORTER are also charged with participating in a cocaine trafficking conspiracy, in violation of 21 U.S.C. § 846, as well as possessing with the intent to distribute, and distributing cocaine, in violation of 21 U.S.C. § 841, and firearms use, carrying, and possession, in violation of 18 U.S.C. § 924(c), relating to their sale of firearms and cocaine to the UC on August 21, 2026. FLOWERS is further charged with those same two crimes (violations of 21 U.S.C. § 841 and 18 U.S.C. § 924(c)) relating to his sale of firearms and cocaine to the UC on multiple other dates. Finally, FLOWERS is charged with possessing a machinegun, in violation of 18 U.S.C. § 922(o), which he sold to the UC during a controlled buy on September 15, 2026—approximately two weeks ago.

FLOWERS and PORTER face minimum terms of imprisonment of twenty and five years, respectively, and maximum terms of life imprisonment. HARRIS faces a maximum term of imprisonment of fifteen years.

## II. Overview of the Case

The charges in the Indictment stem from a months-long scheme by the defendants to traffic guns and narcotics into the New York City area through six transactions with the UC. Two of the transactions occurred in June, two in July, one in August, and the sixth and most recent charged transaction occurred on September 15, 2026. All but one of the controlled buys took place in a public shopping complex parking lot in the Bronx, while the other controlled buy took place on a busy street in Harlem. Between ten and twenty-six firearms—including assault-style rifles—were sold to the UC during each of the buys, as well as a substantial amount of ammunition, more than one hundred cartridges, to be used with the firearms. All subsequent buys after the first buy (in early June 2026) also involved the sale of between about 100 and 200 grams of cocaine to the UC. The firearms and cocaine were sold to the UC in the same transactions. The UC stated during multiple transactions that the UC was, in turn, trafficking the guns to others in the community.

HARRIS supplied the firearms to FLOWERS and PORTER to sell to the UC.[2] In particular, law enforcement obtained communications between HARRIS and PORTER establishing that HARRIS provided guns to be sold to the UC. For example, in one exchange in

---

[2] Numerous firearms sold to the UC had been reported stolen in the Virginia area, which is where HARRIS lives.

June 2026, HARRIS sent PORTER a picture of two guns available for sale and FLOWERS sent that exact photograph to the UC shortly thereafter:




*HARRIS CELLPHONE*




*FLOWERS SENT TO UC*

Moreover, in the hours before an August transaction, law enforcement surveilled HARRIS meeting up with FLOWERS and PORTER, and then transferring what were later determined to be firearms into PORTER's vehicle, before PORTER and HARRIS drove in PORTER's vehicle to the public parking lot in the Bronx where they had previously agreed to meet the UC. HARRIS followed them in his own vehicle to the buy location. Once he got there, HARRIS exited his vehicle and walked inside the glassed-in lobby of a store that used the parking lot—allowing him to maintain eyes on the transaction from afar. After the transaction took place and the UC drove away, HARRIS got into the car with PORTER and FLOWERS for an extended period.

Aside from that transaction, FLOWERS and PORTER—without HARRIS physically present—engaged directly with the UC during the remaining five transactions. PORTER was physically present for two of the transactions, both with FLOWERS, and FLOWERS handled the three remaining transactions alone with the UC. In addition, during the transaction that took place

only about two weeks ago, FLOWERS sold a firearm with an attached machinegun conversion device to the UC, as depicted below:



In total, FLOWERS, PORTER, and HARRIS sold 93 firearms to the UC, and FLOWERS and PORTER sold over 700 grams of cocaine to the UC during these same transactions, giving rise to the firearms use, carrying, and possession charges in the Indictment. Photographs of the

firearms, ammunition, magazines, and cocaine that FLOWERS, PORTER, and HARRIS sold to the UC are below:



*June 2026*



*June 2026*



*July 2026*



*July 2026*



*August 2026*



*September 2026*

## III. Legal Standard

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e).[3] A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v.*

[3] The Court is required to hold a detention hearing on the Government's motion where, as here, the case involves "an offense for which the maximum sentence is life imprisonment" or "involves the possession or use of a firearm." 18 U.S.C. § 3142(f)(1)(B), (E).

*Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character,... past conduct,... [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

There is a rebuttable presumption in favor of detention where, as here with respect to FLOWERS and PORTER, a defendant has been charged with a violation of 18 U.S.C. § 924(c). *Id.* § 3142(e)(3)(B).

## IV. Pretrial Detention is Warranted

The Government seeks detention of FLOWERS, PORTER, and HARRIS based on their danger to the community and risk of nonappearance. All the applicable factors warrant detention of each of the defendants.

*Nature and Circumstances of the Offenses*. The defendants' criminal conduct in this case is serious and reflects their dangerousness to the community. The defendants have been charged with trafficking nearly 100 firearms in New York City, including at least sixteen assault-style rifles, as well as numerous rounds of ammunition, as stated above. Such weapons are inherently dangerous, and their trafficking into New York City is the driving force behind an ongoing epidemic of gun violence. The defendants acted with complete disregard for the danger they created and the lives they put at risk—an impulse that does not simply vanish overnight. There are no gun manufacturers in New York City. Illegal guns flow into the city via traffickers, traveling by car, train, plane, and bus from outside the state. Lack of local access and strict local gun laws create a black market that allows gun traffickers like the defendants to profit at the expense of community safety.

Moreover, the defendants' conduct was not an isolated instance or lapse in judgment, but rather, part of a concerted and calculated scheme to traffic firearms in public, populated areas of New York City. That the defendants were willing and eager to traffic so many firearms (and with respect to PORTER and FLOWERS, cocaine) in public spaces at the expense of public safety—

and that they had access to such a large number of dangerous weapons in the first place—further underscores their dangerousness to the community were they to be released.

Further, FLOWERS has also been charged with possessing a machinegun conversion device (or a "switch"), which he installed in a firearm sold to the UC. Such a device turns a semiautomatic weapon into a fully automatic weapon that can empty an entire clip of bullets in two to three seconds. Machine gun conversion switches exponentially increase the likelihood of mass death on our streets. Instead of firing three or four shots over the course of five seconds, each requiring its own pull of the trigger, someone with a switch could unload 20 or more shots in two seconds while simply squeezing the trigger once. FLOWERS's access to and sale of such a deadly device makes remarkably clear and present the danger he poses to the community.

*Weight of the Evidence*. The evidence in this case is overwhelmingly strong. The defendants are captured on law enforcement surveillance video preparing for and conducting the controlled buys with the UC. PORTER and FLOWERS, who entered the UC's vehicle on multiple occasions, are captured on video and audio during the transactions themselves. Further, all three defendants communicated in the course of the conspiracies with one another and the UC using phone numbers registered in their own names—communications in the Government's possession that plainly reflect their involvement in the trafficking schemes. The defendants were indisputably participants in the charged crimes, and they cannot meaningful contest their identity as the perpetrators and in turn their guilt of very serious crimes carrying very serious punishments.

The incentive for any one of the three defendants to flee or fail to appear for Court is compounded by this overwhelming weight of the evidence, particularly where FLOWERS and PORTER each face mandatory minimum terms of imprisonment and, based on the Government's rough calculation, HARRIS faces a potential Guidelines range of imprisonment of approximately twelve years, at the low end. *United States v. Green*, No. 20 CR 357 (VM), 2020 WL 5814191, at *1 (S.D.N.Y. Sept. 30, 2020) ("The Government's evidence is strong, and, if convicted, Green faces a significant sentence, which gives him an incentive to flee.").

*History and Characteristics.*

PORTER

PORTER has been arrested over twenty times throughout his life and has four convictions (including one felony conviction). In 2012, he was convicted of participating in a scheme to defraud others of greater than $1,000 in property and was sentenced to probation—which he violated, resulting in his incarceration for a short period. PORTER also has multiple narcotics-related convictions including, most recently, in 2018. In August 2018, PORTER was arrested in possession of multiple types of a gravity knife, drugs and drug paraphernalia and charged with multiple New York crimes relating to his possession of those items of contraband. PORTER plead guilty and was sentenced to a conditional discharge.

While the charged conduct involves undoubtedly the most serious crimes with which PORTER has been charged, his repeated contacts with the criminal justice system are telling. PORTER was sentenced to probation in 2012 for his fraud conviction, but violated it and did not stop committing crimes after that—supporting that he is not likely to abide by the conditions of

release imposed by the Court here. In light of his history and the offense conduct, PORTER cannot overcome the presumption in favor of detention.

FLOWERS

With respect to FLOWERS, at present, the Government understands that FLOWERS has not previously been convicted of a crime. But the absence of a prior criminal record, or a limited history of criminal convictions, in no way precludes detention. The Court may (and here, should) find that a defendant poses a danger to the community or a risk of flight based on factors other than a documented history of convictions. Here, those factors include the serious nature and circumstances of FLOWERS's charged conduct and, the mandatory minimum sentence he faces creates a powerful incentive to flee. Moreover, two additional firearms and over 100 rounds of ammunition were recovered from FLOWERS's residence after his arrest, which further underscores the ease with which he has access to firearms. Accordingly, FLOWERS cannot overcome the presumption in favor of detention merely because he lacks a documented history of criminal convictions, particularly given the significant mandatory minimum term of imprisonment that he faces.

HARRIS

HARRIS has an extensive criminal history that includes, but is not limited to: (1) 2013 convictions in the Eastern District of Virginia for his participation in nine armed robberies of financial institutions in Virginia between March and October 2012, for which he was sentenced to a term of 192 months' imprisonment followed by a term of supervised release of three years; (2) a 2013 Virigina state misdemeanor conviction for assault and battery of a family member, for which he received a deferred sentence; and (3) a 2003 Virginia state felony conviction for possession, manufacturing, and selling of a controlled substance.

During each of the armed robberies to which he plead guilty in 2013, HARRIS served as the getaway driver for his two accomplices. HARRIS knew that his accomplices were armed with firearms used to threaten the bank tellers when they committed each of the robberies. HARRIS played a key part in these robberies by helping to plan the crimes, picking locations to rob, conducting surveillance, and providing transportation to and away from the crime scene. During or after two of the robberies, the accomplices discharged their firearms. During a separate robbery, HARRIS refused to stop for law enforcement pursuing his vehicle after one of the robberies, and only was apprehended after crashing his car. A firearm was recovered from HARRIS' vehicle once it was stopped. HARRIS was released from custody in July 2019.

That HARRIS's previous, lengthy term of imprisonment did not deter him from continuing to engage in a life of crime involving guns precludes his release and establishes the serious danger that his release would pose to the community.

*Danger to the Community.* As set forth above, the charged conduct alone establishes that FLOWERS, PORTER, and HARRIS each pose a grave danger to the community based on their established networks to those with ready access to firearms and narcotics. This danger alone, the touchstone for assessing the safety of the community, makes it clear that no one of the defendants should be considered for release.

## V. Conclusion

The above-proffered evidence is certainly not all of the Government's evidence against the defendant, as a bail hearing is not a "mini-trial" or a "discovery tool for the defendant." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). The Indictment and the evidence cited above should dispel any notion that FLOWERS, PORTER, and HARRIS can be released on conditions that would reasonably assure their appearance or the safety of the community. The Government respectfully requests that the defendants be detained pending trial.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s/
Kathryn Wheelock
Rebecca Delfiner
Assistant United States Attorneys
Southern District of New York

cc: Joshua Dratel, Esq. (Counsel to Defendant DWIGHT FLOWERS) (by email)
Neil Kelly, Esq. (Counsel to Defendant TERRENCE PORTER) (by email)